Terry MORGAN, Plaintiff,

v.

UNITED STATES POSTAL SERVICE
et al., Defendants.

No. 75 CV 102–W–1.

United States District Court,
W. D. Missouri, W. D.

Dec. 17, 1975.

William H. Pickett, Kansas City, Mo., for plaintiff.

Bert C. Hurn, U. S. Atty., David M. Proctor, Asst. U. S. Atty., Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

This case raises the question of whether an environmental impact statement (EIS) is required under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (1970), for a proposed expansion of the parking facilities at the Westport station of the United States Postal Service in Kansas City, Missouri. The action currently pends on plaintiff's motion for a preliminary in-

junction which will be granted. The following opinion shall constitute our specific findings and conclusions as required by Rules 52 and 65, Fed.R.Civ.P.

## I. BACKGROUND OF CASE

The present action was commenced on February 7, 1975 by the filing of a complaint alleging that the proposed expansion of the parking facilities at the Westport Postal Station constitutes "major federal action significantly affecting the quality of the human environment," within the meaning of Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). Jurisdiction is predicated on the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and 28 U.S.C. § 1361. Jurisdiction is also present under 28 U.S.C. § 1331 and 39 U.S.C. § 409.

■ Plaintiff, a resident of the Wyandotte-Central Streets neighborhood in which the proposed parking facility is to be located,[1] contends, among other things, that the razing of seven residential structures in order to construct the parking facility will alter the residential character of the neighborhood and contribute to the population decline and housing shortage in the Westport Area of the central city. The plaintiff further alleges that "the project violates both the redevelopment and neighborhood preservation objectives of the Westport Plan," a comprehensive land use proposal for the Westport area. Plaintiff also alleges that the environmental impact assessment (EIA) prepared by defendant pursuant to 39 C.F.R. § 775.14(b) (1975) is inadequate in that it fails to adequately assess such significant environmental factors as the increased vehicular emissions and noise in the area, the potential overloading of storm sewer capacity due to increased water run-off from the paved parking facility, the alteration of land use patterns and the historical character[2] of the entire Westport area. Plaintiff seeks declaratory and injunctive relief to prevent any demolition of existing structures in the Wyandotte-Central Street neighborhood until an adequate EIS has been prepared.

On June 17, 1975 Chief Judge Becker entered a Temporary Restraining Order to prevent the destruction of seven residences adjacent to the Westport Postal Station. No further action was taken by the Postal Service and on August 1, 1975, this Court held an evidentiary hearing on plaintiff's motion for a preliminary injunction. At that hearing the Postal Service agreed to prepare a new EIA which would take into account and adequately assess the environmental factors mentioned by plaintiff. The Postal Service further agreed to reconsider its decision not to file an EIS in light of the new EIA.

The new EIA was filed on August 28, 1975. A minor revision of the new EIA was filed on September 19, 1975. On October 8, 1975 the Postal Service filed a statement declaring that it has "no present intention to process and promulgate an environmental impact statement relating to the subject matter of this case."

## II. FINDINGS OF FACT

The factual circumstances surrounding the proposed expansion of the park-

---

1. The defendants have not challenged the standing of plaintiff to maintain this action. Plaintiff alleges that he has been a resident of the Wyandotte-Central Street neighborhood for three and one-half years, that he is a member of the Old Westport Neighborhood Association, a group dedicated to preserving the residential and historical character of the neighborhood in question, and that he has contributed to the development of the "Westport Plan," a comprehensive land use proposal for the Westport area of Kansas City, Missouri. Clearly, plaintiff has sufficient standing to maintain this action. *United States v. S.C.R.A.P.*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974).

2. The town of West Port was the first settlement in the area now encompassed by the City of Kansas City.

ing facility at the Westport Postal Station are virtually undisputed. The documentary evidence reveals that on February 1, 1973, defendant Theodoric Bland, manager of the Kansas City Postal District, requested authorization from the Regional Office to enlarge the parking area adjacent to the Westport Station in order to accommodate more delivery vehicles [Ex. 1]. Prior to this time the Postal Service had leased the Westport Station, but on August 21, 1973, fee simple title was conveyed to the Postal Service [Stip. ¶ 2(2)]. Thereafter, on August 17, 1973, Mr. Bland submitted a cost-benefit analysis on the proposed motorization of the Westport Station [Ex. 9]. After receiving this further data, the Regional Director of the Engineering Division authorized acquisition of approximately 28,320 square feet adjacent to the Westport Station for development of a parking lot [Ex. 4]. Following acquisition approval, the Postal Service in January, 1974, prepared an Environmental Appraisal Checklist on the proposed project, and concluded that "it does not appear that the utilization of this site for parking of postal vehicles and postal employees will have a significant impact on the environment." [Ex. 7]

Acquisition of the property for the proposed parking facility commenced in April, 1974. A total of seven lots and residences were acquired by the Postal Service [Stip. ¶ 2(3)]. At the time of acquisition, all of the residences were, with the exception of the residence at 3945 Central, either owner occupied or tenant occupied [Stip. ¶ 2(4)].

During the period of acquisition the Postal Service received inquiries from the City Manager's office and from an attorney representing persons in the residential neighborhood around the proposed project [Ex. 10, 11]. The latter inquiry requested information on the type of parking facility to be constructed, and its effect upon the human environment of those persons living nearby [Ex. 12]. The manager of the Real Estate Branch of the Kansas City Postal District responded to the attorney's letter by describing the project as a surface parking facility rather than a parking structure, and stated that the expanded facility would accommodate 15 additional arrivals and departures daily [Ex. 14]. No other information was provided in regard to the possible environmental impact of the proposed project, but shortly thereafter, on September 10, 1974, the manager of the Design and Construction Branch of the Kansas City Postal District requested an environmental impact assessment [Ex. 16]. At this point all the land had been acquired for the proposed parking facility.[3]

An environmental impact assessment (EIA) was prepared by an independent consulting firm and received by the Design and Construction Branch on November 21, 1974. That assessment contained a cursory discussion of several

---

3. This request sent to the Central Regional Office by the Design and Construction manager of the Kansas City District contained the following language:

Request services for the following tasks be provided this office for (1) Environmental Evaluation (EE) Report and (2) Environmental Assessment (EA). Note: EA not required unless EE shows that construction or eventual use will have a potential or actual significant effect on the quality of human environment.

  \*  \*  \*  \*  \*

 8. Kansas City, Missouri—Westport Station

a. PA. No. 4–48–284218–C–007 (copy attached).

b. New construction, expanded vehicle parking; USPS owned.

c. The site is north of existing Westport Station postal facility (27,069.5 SF) extending along Central Street north for 200 foot and 120 foot in depth; and, north along Wyandotte Street for 25 foot and 120 foot in depth.

d. Environmental Assessment by March 1, 1975.

environmental factors and concluded that:

> The construction of this facility will not have a significant adverse effect on the environment and the landscaping and maintenance will have a beneficial effect.

> The construction of this facility will not be environmentally controversial; therefore, an environmental impact statement will not be prepared.[4]

During the time the EIA was being prepared, plaintiff sent a letter to Mr. Bland, the Kansas City Postal District Manager, inquiring about the project. He was informed that an environmental assessment was being prepared and that the Postal Service would determine whether an environmental impact statement was required based upon the findings in the assessment [Ex. 21]. Shortly after the assessment was received by the Service, a negative declaration under 39 C.F.R. § 775.5 (1975) was made which stated that "the proposed use of the subject land will not have a significant adverse impact on the environment" and that no environmental impact statement would be prepared. [Ex. 23]. Subsequently, the Environmental Protection Agency [EPA], after a review under Section 309 of the Clean Air Act, 42 U.S.C. § 1857h–7 (Supp.1975), also determined that the proposed expansion of the parking facility would "not result in an unsatisfactory action from the point of public health, welfare or environmental quality." [5]

At this point the Postal Service had apparently resolved the environmental problems associated with the project to its satisfaction. However, the Postal Service then encountered other problems with Kansas City Zoning Ordinances. On January 13, 1975, the Service applied for an auxiliary use permit for employee parking on the proposed parking facility [Stip. ¶ 2(7)]. This application was denied, but on appeal the City Board of Zoning Adjustment granted the Postal Service a permit. Thereafter, a petition for writ of certiorari was filed in the Circuit Court of Jackson County, and on March 24, 1975 a Temporary Restraining Order was issued preventing the City from issuing any permits to approve any further expansion of the parking facility at the Westport Postal Station [Stip. ¶ 2(9, 10)].

Undaunted by the injunction, the Postal Service proceeded to issue an Invitation to Bid on the design and construction of the parking facility expansion [Ex. 27]. On May 30, 1975, the manager of the District Design and Construction Branch notified the winning contractor that his bid had been accepted, and shortly thereafter sent him a notice to proceed [Ex. 28, 29]. Any demolition or construction work was prevented by Chief Judge Becker's Temporary Restraining Order issued on June 17, 1975.

At the hearing on the preliminary injunction held on August 1, 1975, the Postal Service agreed to have a new environmental impact assessment prepared and to reconsider its decision not to file an EIS. It was also agreed that any razing of the structures adjacent to the Westport Station would be suspended until the Postal Service had reached a new decision and the plaintiff's motion for preliminary injunction had been ruled. After the hearing, the Postal Service contacted Midwest Research Institute

---

4. The assessment seemed to assume that the only effect of the project would be to remove undesirable vacant structures:

> The proposed facility will have a brief undesirable effect on the area during construction, with the related noise, dust, traffic and parking, etc. However, the resulting facility will be able to serve the community much more efficiently than the existing arrangement. The removal of the empty buildings will reduce the possibility of injury to trespassers. The buildings also represent a great fire hazard to the community.

5. The scope of the EPA investigation was limited to the seven areas of its responsibility: air quality, water quality, drinking water supplies, noise, solid waste, pesticides and radiation. [Ex. 26].

here in Kansas City, and requested that they prepare a new environmental assessment. That assessment was completed on August 22 and was filed in revised form on September 19, 1975.

The new assessment contains a discussion of eleven potential environmental impacts of the proposed parking facility. The assessment concludes as follows:

> The determination of what precisely constitutes a "major action significantly affecting the quality of the human environment" is often a matter of judgment and, therefore, difficult to assess. However, there are certain "major actions" which, according to the Federal Register [Postal Service—Environmental Statement Procedures], require environmental impact statements. One of these is "any proposed action which is likely to be environmentally controversial." Two such situations which exist in reference to the proposed action are discussed below.

### A. *Land Use Problems*

The desires and goals of many Westport residents for their community have been effectively articulated in a comprehensive area plan. While the City Council's approval of the plan is still pending, the City Plan Commission, a responsible and professional planning agency, has recommended this plan be approved. It is possible that the plan's goals for the area affected by the proposed project could never be realized; hence, the probable future of this neighborhood area could only be projected after considerably more study. However, it can be stated that the proposed action would adversely affect the goals of this plan

in irreparably changing the land use and significantly altering the character of the residential area in the vicinity of Central and Wyandotte streets. This must be considered environmentally controversial.

### B. *Runoff/Drainage Problems*

An increase in surface water runoff over present roofed housing and shed areas for the proposed site was shown to be approximately 37%. This runoff is to be drained to a new manhole installation on Central Street where a 15-in. diameter combination sewer and storm sewer line exists. Because of registered complaints of basement flooding in the 3900 block on Central, a controversial issue arises concerning increased runoff/drainage, and because of this, the proposed facility may have an adverse effect on the present aggravated sewer and storm sewer condition in that location.

### D. *Deduction*

Based on guidelines in the Federal Register concerning preparation on environmental impact statements, it is believed that an environmental impact statement may be required if controversial items cannot be mitigated. It is possible that the entire area in question is going to become primarily commercial anyway—and that the old houses will give way to a mixture of apartment complexes and businesses. To make such determinations will require a study of greater depth that is possible in this assessment. The runoff problem can probably be corrected by installing a larger storm sewer line (currently 15 in.) from the proposed new manhole to the manhole currently located at Central Street and Westport Road.[6]

6. Pursuant to the Court's direction at the hearing on preliminary injunction, plaintiff submitted affidavits by both residents of the Wyandotte-Central Street neighborhood and experts in urban ecology. These affidavits focused mainly on the land use problems of the project which were adequately summarized in the second EIA. One area resident did refer to the basement flooding problem.

Defendants submitted two affidavits, one by the manager of the Real Estate Board and the other by the manager of the Design and Construction Branch of the Kansas City Postal District. These affidavits dealt with the manner in which the Postal Service arrived at its first decision not to file an EIS. They do not specifically address either the land use problems or the drainage problems referred to in the second EIA.

After the second EIA was filed, the Postal Service sent a letter to plaintiff indicating its desire to discuss the possibility of "mitigating" the adverse environmental effects of the project under 39 C.F.R. § 775.1 (1975). Plaintiff's counsel responded that plaintiff believed an EIS was required and that he wished "to have input in the environmental impact statement process" along with other persons affected. Plaintiff declined to accept defendant's offer to compromise this suit. At this point the Postal Service finally determined that it would not file an EIS.

## III. CONCLUSIONS OF LAW

### A. *Applicability of NEPA to the Postal Service*

A threshold issue has been presented by the Postal Service in this case with regard to the applicability of NEPA to Service actions. The Service argues that the requirements of NEPA do not apply to its projects because the Postal Reorganization Act of 1970, exempts the Service from all "Federal law[s] dealing with public or Federal contracts, property, works, officers, employees, budgets or funds . . . ." 39 U.S. C. § 410(a) (Supp.1975).[7]

■ In *Chelsea Neighborhood Association v. United States Postal Service,* 516 F.2d 378 (2d Cir. 1975), the Second Circuit Court of Appeals considered the same argument by the Postal Service. After carefully reviewing both NEPA and the Postal Reorganization Act, and discussing the legislative history and policy behind both Acts, the Court concluded that "section 410(a) does not exempt the Service from NEPA and that the Service must comply with the requirements of that statute." *Id.* at 386. We agree with that conclusion and find that the Postal Service is subject to the commands of NEPA.[8]

### B. *Requirements of NEPA*

The National Environmental Policy Act embodies this Nation's commitment

---

7. The Postal Reorganization Act also contains several exceptions to this general exemption, and it enumerated many statutes which would remain applicable to the Service. 39 U.S.C. § 410(b) (Supp.1975). NEPA was not one of the statutes specifically made applicable to the Service by the Act.

8. Judge Feinberg noted that the purpose of Section 410(a) of the Postal Reorganization Act was to free the Postal Service from bureaucratic entanglements built up over the years which, in the opinion of Congress, hampered its day-to-day functioning. 516 F. 2d at 383. This purpose was contrasted with the broad social policy goal underlying the enactment of NEPA:

> The contrast between the specific concerns of section 410 and the broad policy mandate of NEPA is instructive. The Postal Reorganization Act was designed to modernize the day-to-day operation of the Service; NEPA was passed "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. Section 410 involves "contracts, property" and "works"; NEPA encompasses major agency actions "such as project proposals, proposals for new legislation, regulations, policy statements, or expansion

or revision of on-going programs." S.Rep. No. 91–296, supra, at 20. The Postal Reorganization Act is managerial; NEPA is policy oriented. In fact, insofar as the former act was designed to enhance day-to-day business discretion, NEPA in no way interferes. NEPA does not require specific results in particular situations. It merely establishes a "reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations." *Calvert Cliffs',* supra [*Calvert Cliffs' Coordinating Committee, Inc. v. U. S. Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109], 449 F.2d at 1112. [516 F.2d at 384]

Moreover, it is also interesting to note that the Postal Service regulations, although not conceding that the Service is subject to NEPA, express the policy of the Service "to comply voluntarily with such statutes . . . to the extent practical and feasible consistent with the public interest and fulfillment of the primary mission of the Postal Service." 39 C.F.R. § 775.1(b) (1975). The regulations then proceed to describe the procedure by which the Service will prepare and file environmental impact statements on major actions significantly affecting the quality of the human environment.

to environmental quality. In it Congress sought to:

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources. [42 U.S.C. § 4331(b)(1)–(6)]

Under the Act, each Federal agency is required to:

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environment impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. [42 U.S.C. § 4332(2)(C)]

■■ The requirement of an impact statement not only was designed to compel consideration of environmental factors by the agency contemplating a proposal, but also "was intended to effect substantive changes in decisionmaking." *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289, 297 (8th Cir. 1972), *cert. den.* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). Consistent with this purpose, an impact statement should be prepared for any action which *could* have a significant effect on the environment. See *M.P.I.R.G. v. Butz*, 498 F.2d 1314, 1320 (8th Cir. 1974).

### C. *Postal Service Decision Not to File an EIS*

The Postal Service in this case attempted to follow its own procedures in determining the environmental consequences of the proposed expansion of the Westport parking facility. According to the Service's regulations, the responsible Service official is to prepare an environmental assessment "for each major action." 39 C.F.R. § 775.3(a)(ii) (1975). Presumably, this project was deemed to be a "major action" since the manager of the Design and Construction Branch requested an environmental impact assessment prior to the filing of the suit.[9] The assessment is intended to identify "significant environmental impact (if any)." 39 C.F.R. § 775.3(a)(ii) (1975). The first assessment, received by the Service on November 21, 1974, found that the proposed facility would not have a significant adverse effect on the environment and further conclud-

---

9. The Eighth Circuit Court of Appeals has suggested that the size of the proposed action should not be considered independent of its impact on the environment. In short, any project that could significantly affect the quality of the human environment, no matter whether it is "major" or "minor" in terms of time for completion or cost, requires an impact statement. See *M.P.I.R.G. v. Butz, supra*, at 1321–22.

ed that the parking facility "will not be environmentally controversial." Consistent with this conclusion, the Service initially issued a negative declaration under 39 C.F.R. § 775.5, stating that no EIS would be prepared.

The first environmental assessment on which the Service based its decision contains only conclusory statements on the potential effects of the proposed parking facility. Less than two pages of environmental effects are included. No reference is made to the land use consequences, beyond a statement that "Kansas City zoning officials have no objection to this variation [in use] and, in any event, Missouri Zoning regulations state that 'if the Government and/or Postal Service purchases the land, constructs the facility, retains ownership, the zoning regulations are not applicable.'" No mention is made of the Westport Plan or the possible effect on the residential character of the neighborhood in which the facility is to be located. Moreover, under the heading of "Water Quality," the assessment merely concludes, without any supporting discussion or analysis, that:

> No factors are expected to have an adverse effect on water quality. Storm runoff from paved areas will be slightly increased but this should not overburden the storm sewer system.

We recognized the obvious inadequacy of the assessment at the hearing held on the preliminary injunction and, because of the need for a sufficient record on which to review the Service's determination not to file an EIS, we suggested that the Service obtain another assessment. See *Hanly v. Mitchell*, 460 F.2d 640, 647–48 (2nd Cir. 1972); *cert. den.* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). We set up a procedure whereby the Service could take into account and adequately assess the environmental effects proposed by plaintiff. The Service agreed to this procedure and further agreed to render a new decision in regard to whether an EIS should be filed on the basis of the new assessment. The new assessment concluded, on the basis of a much more thorough and exhaustive analysis of potential environmental effects, that at least two aspects of the project could be considered "environmentally controversial" within the meaning of the Postal Service regulations. The Service, however, again decided that no EIS would be prepared. It is that decision which we will now proceed to review.

D. *The Standard of Review Under NEPA*

■■ It is conceded that the threshold decision on whether an EIS is required under NEPA for a particular federal action is one for the agency in the first instance. Once it is determined, however, that a particular project is not "major Federal action significantly affecting the quality of the human environment," and that no EIS is required, then the agency's decision is reviewable under the mandatory language of the statute.

The standard of review of an agency's determination under NEPA has not been uniform throughout the Circuits. Several Circuits hold that the appropriate test is the "arbitrary, capricious" standard established by the Administrative Procedure Act. See, e. g., *Hanly v. Kleindienst*, 471 F.2d 823, 829–30 (2nd Cir. 1972), *cert. den.* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *First National Bank v. Richardson*, 484 F.2d 1369, 1381 (7th Cir. 1973). Other Circuits have concluded that the mandatory language of the statute requires confining agency discretion not to file an EIS within narrower bounds, and consequently measure the agency's decision against a "reasonableness" standard. See e. g., *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1249 (10th Cir. 1973); *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 (5th Cir. 1973).

■ As the Service in this case recognizes, the Eighth Circuit follows the latter approach. An agency decision not to file an EIS must be reasonable under

the circumstances of the case. *M.P.I.R.G. v. Butz, supra*, at 1320.[10] Obviously, a reasonableness standard involves a much stricter scrutiny of the agency decision than an arbitrary, capricious test. We must determine then whether the Postal Service's decision not to prepare and file an EIS was reasonable under the facts and law applicable to this case.

We must determine whether the agency's conclusion that the proposed expansion of the Westport parking facility will have no significant impact on the human environment is consistent with is regulations and warranted by the findings in the environmental assessment.[11]

### E. Postal Service Regulations

The Council on Environmental Quality (CEQ) has set forth the criteria to be considered in identifying major actions significantly affecting the environment. See 40 C.F.R. § 1500.6 (1975).[12] In ad-

---

10. Chief Judge Gibson stated the following with regard to this standard:

> We think that the threshold decision as to whether or not to prepare an EIS should be reviewed not on the arbitrary and capricious standard used to test a substantive decision which entails a balancing and weighing of alternatives already studied, but on the grounds of its reasonableness. . . . To upset an agency determination not to prepare an impact statement, it still must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could significantly affect the quality of the human environment.

11. Judge Hunter has summarized the standards by which an agency decision not to file an EIS should be scrutinized:

> The agency must identify all areas of potential environmental concern flowing from the proposed action, and must take a "hard look" at all potential impacts so identified, including secondary impacts. Sufficient investigation must be done and sufficient data gathered to allow the agency to consider realistically and in an informed manner the full range of potential effects of the proposed action. In making a negative determination as to the applicability of § 102(2)(C) to a particular project, the agency must avoid making "bald conclusions" as to the magnitude or variety of potential effects of the proposed action. Similarly, the agency is not permitted to base a negative decision as to the applicability of § 102(2)(C) upon superficial reasoning or perfunctory analysis. Rather for an agency's threshold decision that § 102(2)(C) does not apply to a particular proposed action to be upheld in review, it must affirmatively appear from the administrative record, and from the written assessment where one is prepared, that the agency has given thoughtful and reasoned consideration to all of the potential effects of the proposed action, and that a convincing case has been made that the proposed impacts are insignificant after

a careful balancing of the relevant factors. See, generally, *Hanly v. Mitchell*, 460 F.2d 640 (2d Cir. 1972); *Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972); *Arizona Public Serv. Comp. v. Federal Power Comm.*, 157 U.S.App.D.C. 272, 483 F.2d 1275 (1973); *Maryland-National Cap. Pk. & Pl. Comm. v. U. S. Postal Service*, 159 U.S. App.D.C. 158, 487 F.2d 1029 (1973); *First National Bank of Chicago v. Richardson*, 484 F.2d 1369 (7th Cir. 1973). [*McDowell v. Schlesinger*, 404 F.Supp. 221, (1975).]

12. Indirect or secondary impacts must be considered in assessing the environmental consequences of a proposed action. *M.P.I.R.G. v. Butz, supra*, at 1322. The Council on Environmental Quality has delineated the nature of such secondary effects:

> Secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. Many major Federal actions, in particular those that involve the construction or licensing of infrastructure investments (e. g. highways, airports, sewer systems, water resource projects, etc.), stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities. Such secondary effects, through their impacts on existing community facilities and activities, through inducing new facilities and activities, or through changes in natural conditions, may often be even more substantial than the primary effects of the original action itself. For example, the effects of the proposed action on population and growth may be among the more significant secondary effects. Such population and growth impacts should be estimated if expected to be significant (using data identified as indicated in § 1500.8(a)(1) and an assessent made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water and public services, of the area in question. [40 C.F.R. § 1500.8(a)(2)(iii) (1975)]

dition, the Council recommends that each agency "develop specific criteria and methods for identifying those actions likely to require environmental [impact] statements and those actions likely not to require environmental [impact] statements." 40 C.F.R. § 1500.6(c) (1975). The Postal Service has commendably followed this suggestion and its regulations contain certain guidelines for determining what actions require environmental impact statements:

The determination of what is a "major action significantly affecting the quality of the human environment" is in large part a matter of judgment, based on an assessment of the circumstances of the proposed action.

(a) Major actions which require environmental impact statements include:

(1) Recommendations on legislation authorizing programs or activities which would have a significant environmental impact;

(2) Any Postal Service program, activity or project which will have an actual or probable impact on the quality of human environment;

(3) Promulgation of rules, regulations, and instructions which would affect the environment; and

(4) Any proposed action which is likely to be environmentally controversial.

(b) Actions significantly affecting the human environment can be construed to be those that:

(1) Degrade environmental quality even if beneficial effects outweigh the detrimental ones;

(2) Curtail range of possible beneficial uses of the environment including irreversible and irretrievable commitments of resources;

(3) Serve short term rather than longterm environmental goals;

(4) May be localized in their effect, but nevertheless, have a harmful environmental impact; or

(5) Are attributable to many small actions, possibly taken over a period of time, that collectively have an adverse impact on the environment.

(c) Environmental subject areas include, but are not limited to:

(1) Actions which directly and indirectly affect human beings through water, air, and noise pollution, undesirable land use patterns, solid waste disposal, pesticide and herbicide use, and transportation and handling of hazardous materials;

(2) Human population distribution changes and its effect upon urban congestion (including vehicular traffic), water supply, sewage treatment facilities, other public services, and threats to health; and

(3) Ecological systems such as wild-·life, fish, and other marine life. [39 C.F.R. § 775.4 (1975)].

When tested against these criteria, the Service's decision not to file an EIS in this case simply cannot be found to be reasonable within the meaning of the applicable legal test.

The final environmental assessment concluded that the effect of this project on land use patterns and on surface water runoff would be "environmentally controversial." The Service's regulations provide that both land use and drainage impacts are to be considered in determining whether the project has a significant effect on the environment and specifically requires an EIS for "any proposed action which is likely to be environmentally controversial." 39 C.F.R. § 775.4(a)(4).[13]

The Postal Service has, however, more narrowly confined its discretion not to file an EIS by omitting the qualifying term "highly" from its regulations.

The word "controversial" in the CEQ guidelines has been construed to mean a dispute over the environmental effect of proposed ma-

13. The term "environmentally controversial" appears to be derived from the CEQ guidelines, which require an environmental impact statement for "proposed major actions, the environmental impact of which is likely to be highly controversial . . . ." [40 C.F.R. § 1500.6(a) (1975)]

■■ We find and conclude that the Postal Service's decision not to file an EIS in this case was unreasonable under the circumstances and contrary to its own regulations. We further find and conclude that, based on the final environmental assessment, the proposed expansion of the parking facility at the Westport Postal Station constitutes major federal action significantly affecting the quality of the human environment, and that an environmental impact statement is required.[14]

## F. Injunctive Relief

Having concluded that the Service has not complied with NEPA, we next proceed to proper remedy. Plaintiff seeks a preliminary injunction "enjoining all defendants herein from destroying seven (7) homes to construct a parking lot for the Post Office in the Westport area of Kansas City, Missouri" until the Service complies with NEPA. We find and conclude that such injunctive relief is appropriate.

■■ Although Congress did not create an absolute right to injunctive relief for violations of NEPA, the preliminary injunction is the "vehicle by which a declared congressional policy can be effectuated." *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1184 (6th Cir. 1972). General principles of equity are applicable in NEPA cases, and the court's discretionary power to enjoin further activity must be exercised according to those principles. *Environmental Defense Fund v. Froehlke*, 348 F.Supp. 338, 356 (W.D. Mo.1972); *aff'd.* 477 F.2d 1033 (8th Cir. 1973). The factors to be considered in determining whether equitable relief should be granted include (1) the presence of immediate and irreparable harm to plaintiffs; (2) the probability that plaintiff will succeed on the merits; (3) the harm to defendants should the injunction be granted; and (4) the public interest involved in the grant of preliminary relief. See 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948 at 430 (1973).

■ In this case the plaintiff has clearly demonstrated that irreparable harm will result if the project is permitted to proceed without an EIS. The residential character of the Wyandotte-Central Street neighborhood will be drastically altered if the Service is allowed to proceed with the razing of the seven houses acquired. Moreover, even if this adverse environmental effect could later be remedied, plaintiff need

jor action rather than mere opposition to the action, the environmental impact of which is relatively undisputed. *Hanly v. Kleindienst, supra*, at 830. The latter interpretation, it is argued, would result in an EIS being required whenever a decision not to file one would provoke a lawsuit. *Id.* at 830, n. 9A. The use of the qualifying term "environmentally" in the Postal Service regulations appears intended to convey the former meaning. In using the term "environmentally controversial," the final assessment clearly refers to a dispute over the impact of the proposed parking facility expansion on land use patterns and drainage in the area affected.

14. The Service did not choose to file a brief in support of its negative declaration after the second environmental impact assessment was prepared. However, in its initial Suggestions in Opposition to the Plaintiff's Motion for Preliminary Injunction, the Service argued that "NEPA contemplates some federal actions for which impact statements will not be required." We agree that NEPA does not require an EIS for every federal action that would have *some* impact on the environment. See, e. g., *Hanly v. Kleindienst, supra*; *First National Bank v. Richardson, supra*; *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421 (5th Cir. 1973) and *Julis v. City of Cedar Rapids*, 349 F.Supp. 88 (N.D.Iowa 1972). We also agree that the significance of the environmental impact of any action is primarily a matter of judgment under the circumstances of the particular action contemplated.

However, the agency's judgment and decision must be tested for reasonableness. When an agency promulgates regulations that limit its discretion not to file an EIS, then it must follow those regulations, even though they may go beyond the actual requirements of NEPA. It is clearly unreasonable for an agency not to follow its regulations and determine that there is no significant environmental effect when the supporting data is entirely to the contrary.

not show irreparable harm to the environment as a prerequisite to preliminary injunctive relief.

The harm against which NEPA's impact statement requirement was directed was not solely or even primarily adverse consequences to the environment; such consequences may ensue despite the fullest compliance. Rather NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions and had decided that the public benefits flowing from the actions outweighed their environmental costs. Thus, the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates. And, for purposes of deciding whether equitable relief is appropriate, we think that this harm matures simultaneously with NEPA's requirements, i. e., at the time the agency is, under NEPA, obliged to file the impact statement and fails to do so. [*Jones v. Redevelopment Land Agency,* 162 U.S.App. D.C. 366, 499 F.2d 502, 512 (1974)]

Plaintiff's probability of success on the merits of this action presents the usual problem faced in most environmental cases. Plaintiff has, of course, shown more than a probability of success with regard to the applicability of NEPA. We have already held that an EIS is required for this project. But plaintiff may be less successful in his ultimate attempt to prevent construction, or mitigate the environmental effect of the proposed parking facility expansion.

We find and conclude, however, that plaintiff has shown sufficient probability of ultimate success to merit injunctive relief.

The harm to the Postal Service that would result from a preliminary injunction has not been analyzed by the parties. One possible adverse consequence of injunctive relief would be the effect on the Service's contract for construction of the parking facility. The Service has not chosen to elaborate on this issue and we do not find sufficient injury to the defendants to preclude injunctive relief.

■ Finally, the public interest involved also appears to favor preliminary injunctive relief. The Westport Plan, a comprehensive land use proposal for the Westport area, would be adversely affected by the destruction of the seven residential structures. Furthermore, the drainage problems created by the project could overburden the sewer system in the Westport area and cause basement flooding in adjacent homes.[15] Also, the zoning ordinance of Kansas City, Missouri may be violated if construction of the parking facility was allowed to proceed. In conclusion, we find and conclude, after balancing the equitable factors mentioned above, that in order to preserve the status quo while an EIS is prepared and the environmental factors adequately evaluated, a preliminay injunction preventing any destruction of the seven residential structures should issue.[16]

Accordingly, and for the reasons stated, it is

Ordered (1) that plaintiff's motion for a preliminary injunction should be and the same is hereby granted. It is further

Ordered (2) that plaintiff shall within five (5) days from the date of this order submit a form of order enjoining defendants from razing any of the residen-

---

15. The final EIA referred to the basement flooding already reported in the neighborhood and concluded that, in spite of a proposed new manhole installation, "it is impossible to say that increased run-off from the new parking lot will not adversely affect storm sewer capacity and basement flooding due to backup of water in the combination sewer system."

16. The temporary injunction issued in this case will terminate when a final EIS is filed by the Service. Challenges to the adequacy of the EIS must be made in a separate suit. *M.P.I.R.G. v. Butz, supra,* at 1325, n. 32.

tial structures acquired for the proposed parking facility at the Westport Postal Station until an environmental impact statement has been prepared.