**COMO–FALCON COALITION, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF LABOR, Raymond Marshall, United States Secretary of Labor, Richard C. Gilliland, Regional Administrator, United States Department of Labor, Rudy Perpich, Governor of the State of Minnesota, Defendants.**

Civ. No. 3–78–64.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 11, 1978.

Ronald J. Riach, St. Paul, Minn., for plaintiff.

Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., and Howard L. Robinson, Dept. of Labor, Washington, D. C., for the Federal defendants.

William P. Marshall, Sp. Asst. Atty. Gen., St. Paul, Minn., for Governor Perpich.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This case presents the issue whether establishment of a Job Corps center on the

former campus of Bethel College and Seminary in St. Paul constitutes a "major Federal action significantly affecting the quality of the human environment." National Environmental Policy Act of 1969 (NEPA) § 102(2)(C), 42 U.S.C. § 4332(2)(C). If so, NEPA mandates preparation of an environmental impact statement by the responsible federal official. The Department of Labor determined on November 3, 1977, that an environmental impact statement was unnecessary. (Defs. Ex. 6) This Court on February 22, 1978, preliminarily enjoined establishment of the center. Plaintiff had at that time demonstrated probable success on its claim that the Department of Labor's negative assessment of environmental impact was unreasonable. Based on the administrative record then before it, the Court found that the Department had either failed to consider the environmental impact of the proposed center on the surrounding neighborhood or failed to develop a reviewable record of such external environmental effects. (Memorandum and Order, Feb. 22, 1978)

Since the date of the preliminary injunction, the Department of Labor has compiled the administrative record on which its initial negative assessment of environmental impact was based. In addition, it has conducted a supplemental study and reassessment of the environmental impact of the proposed center, and affirmed the original determination that an environmental impact statement was not required in the circumstances. On November 6 and 7, 1978, this Court held a hearing on the propriety of granting plaintiff permanent injunctive relief pending completion of an environmental impact statement. Based on the administrative record, the evidence adduced at the hearing, the memoranda of counsel, and all files, records and proceedings herein, the Court concludes that the Department of Labor's negative assessment of environmental impact was not unreasonable. Because the proposed Job Corps center is thus not a major federal action significantly affecting the quality of the human environment, no environmental impact statement need be prepared, and judgment will be entered for defendants. The preliminary injunction issued by this Court on February 22, 1978, is dissolved and of no further force and effect. This Memorandum constitutes the Court's Findings of Facts and Conclusions of Law.

## FACTUAL BACKGROUND

Defendant United States Department of Labor through its Secretary, Raymond Marshall, and its Regional Administrator, Richard C. Gilliland, proposes to establish a Job Corps center on the former campus of Bethel College and Seminary, 1480 North Snelling Avenue, St. Paul. Enrollees at such enters are disadvantaged youths aged 16 to 21 who receive basic education, vocational skills training, work experience, and counseling and health services. (See, 29 U.S.C. §§ 911, 918, as amended, Comprehensive Employment and Training Act Amendments of 1978 §§ 450, 457; Defs. Ex. 52, at 8, 27–28) Job Corps centers are designed to provide a structured environment with round-the-clock supervision in which corpsmembers can develop marketable skills and a sense of responsibility. The proposed center is to be residential and coeducational with a maximum of 411 corpsmembers and a staff of approximately 140. The Department of Labor expended $1.86 million to purchase the site. Substantial additional federal funds will be required to refurbish the existing eight buildings ($1.01 million) and to operate the center ($2 million per year). (Fed. Defs. Answer, p. 3, ¶ 7).

The site chosen for the Job Corps center had been used since 1914 as the campus of Bethel College and Seminary. Bethel College is owned and operated by the Baptist General Conference, and is affiliated with Bethel Theological Seminary, a graduate professional school which has been located on the same campus. In September, 1972, the college and seminary completed a move to a new campus in suburban Arden Hills. Student enrollment at the Bethel campus during the 1971–72 school year numbered 1139, of whom 397 resided on campus. Since the fall of 1972, the college has continued to use the Snelling site as dormitory housing for 400 to 430 students, who must

commute daily to classes on the new campus in Arden Hills. Besides the three dormitories, an administration building, library, seminary building, heating plant, and field house occupy the 8.3-acre campus in northwest St. Paul. (Defs. Exs. 4; 52, at 29, 31–32, 35–69) The Job Corps proposal contemplates no additional building construction. (Defs. Ex. 41, pt. 1, ¶ 1)

Plaintiff is a nonprofit corporation composed of residents and owners of residential property in proximity to the site of the proposed center. (Complaint, ¶ 1) Adjacent to the former Bethel campus on the north, east, and south are single-family dwellings comprising a middle-class residential neighborhood. Across Snelling Avenue to the west, in the City of Falcon Heights, lies the Minnesota State Fairgrounds. Como Park, a recreational complex featuring a zoo, golf course, conservatory, park, and lake, stands a half mile to the east. A small shopping plaza, Har Mar Mall, lies one-half mile to the north in the City of Roseville. Rosedale, a major regional shopping center located in Roseville, stands approximately one mile distant. The Bethel site and the adjacent St. Paul neighborhood are zoned R–4, a single-family residential district. (See generally, Defs. Ex. 52, at 75–96; Pltf. Ex. 42; testimony of the Hon. June Demos)

The thought of establishing a Job Corps center in Minnesota originated with the Governor's Council on Employment and Training. (Defs. Ex. 52, at 7) On March 30, 1977, the staff of the Governor's Manpower Office met with state CETA prime sponsors and selected seven potential sites for a Job Corps facility. In May, the regional office of the Job Corps conducted an initial site survey of two of the potential locations—the Bethel campus (Defs. Ex. 1) and a junior high school in a western Minneapolis suburb. The junior high school was found unsuitable because it lacked residential facilities. (See, Defs. Ex. 52, at 25, 399, A–59 to –68) The Bethel site, however, seemed suitable and a more extensive Site Utilization Study was conducted in early September. (Defs. Ex. 4) On May 25, 1977, representatives from the St. Paul

Mayor's office explained at a meeting of community residents the proposal to establish a Job Corps center on the Bethel site, but it was not until October, 1977, that the proposal resurfaced and became the subject of public controversy.

On October 17, 1977, the Secretary of Labor informed Governor Perpich of his intent to establish a Job Corps center on the Bethel campus. Pursuant to 29 U.S.C. § 925(c), the Governor was given 30 days in which to disapprove the project. On October 20, a representative of the regional office of the Department of Labor attended a meeting of community residents in an effort to explain the operation of the proposed Job Corps center. The residents in attendance indicated resistance to the placement of the center within their neighborhood. On October 28, 1977, the Mayor of St. Paul pledged his support for the Bethel proposal, but the municipalities of Roseville and Falcon Heights adopted resolutions against the proposed center. (See, Defs. Ex. 26; Pltf. Exs. 36, 37; testimony of the Hon. June Demos; testimony of the Hon. Willis Warkentien) Neighboring residents continued to voice their opposition in a variety of public forums throughout the rest of 1977.

Because of the opposition in the local community, Governor Perpich desired to investigate the proposal before determining whether to exercise his right of disapproval. In an apparently unprecedented request, the Governor sought and received extensions of the 30-day period prescribed in 29 U.S.C. § 925(c). After meeting with neighborhood residents and investigating the impact of other Job Corps centers and the possibility of alternative sites (see, Defs. Ex. 52, at A–272 to –282), the Governor on December 29, 1977, conditionally approved establishment of the Job Corps center:

> After a systematic and thorough investigation, I am satisfied that Bethel is the proper site and that the program will be beneficial to our state. As you know, this decision was not made hastily; and I think the process we followed in exam-

ining the Job Corps program and alternative sites was a useful one. The conditions of approval agreed upon by the regional office staff will, in my opinion, help us to make this center a model Job Corps facility. . . .

Let me specify these conditions, as they were discussed, to avoid misunderstandings in the future. First, a community advisory council will be established to participate in the determination of center policies. Second, the community will have representation in the selection of the contractor and the screening of potential enrollees. Third, the center will serve Minnesota youth exclusively. Fourth, no felons will be admitted to the program. In conjunction with the establishment of the center, I have asked the Minnesota Crime Control Planning Board to monitor the impact of the center on neighborhood crime. If, over a period of time, there is a severe negative impact on the neighborhood, I will ask the Department of Labor to phase out the program. Fifth, the recreational facilities will be upgraded and made available to the community on a scheduled time basis. In addition, adequate off-street parking will be provided for center staff and visitors. And finally, Job Corps students will participate in neighborhood improvement programs.

(Defs. Ex. 7, at 1–2) The conditions of approval, also apparently unprecedented, were to be the subject of further negotiation by the Governor's office and the Department of Labor.

On February 1, 1978, plaintiff commenced this action to enjoin establishment of the Job Corps center. At the hearing on February 22, 1978, plaintiff demonstrated probable success on the merits and threatened irreparable injury, and accordingly the Court granted preliminary injunctive relief. Negotiations between the Governor's office and the Department of Labor were not enjoined because of the possibility that an agreement might minimize adverse environmental effects. The negotiations culminated in a Memorandum of Agreement between the Department of Labor and the Governor of Minnesota (Defs. Ex. 41) on April 18, 1978.

Plaintiff argues principally that the Department of Labor failed to comply with NEPA in determining that an environmental impact statement was not required. In addition to other contentions, it alleges that the proposed Job Corps center is not a permitted land use under St. Paul zoning ordinances. Further, it contends that provisions of the Memorandum of Agreement between the Governor and the Department of Labor which might minimize adverse environmental effects are invalid and unenforcible. Plaintiff also alleges that the Department of Labor failed to submit an adequate "plan" to the Governor as required by 29 U.S.C. § 925(c). The Governor's approval of the center in reliance on the allegedly inadequate plan submitted to him is the sole basis for his status as a defendant.

## NEPA

■ The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–47, reflects congressional respect for the interrelationship of an environment and its inhabitants. Congress declared the nation's environmental policy in lofty terms:

The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive

harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

NEPA § 101(a), 42 U.S.C. § 4331(a). Implementation of this policy is to be achieved more by procedural than substantive means. In essence, federal agencies must consider environmental amenities and values alongside traditional economic and technological concerns. Only then are administrative decisions fully informed. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Section 102 of NEPA mandates:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

. . . .

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

. . . .

42 U.S.C. § 4332.

The instant controversy focuses on the action-forcing language of section 102(2)(C). The environmental effect of "major Federal actions significantly affecting the quality of the human environment" must be assessed in an environmental impact statement. Whether a given project meets these threshold requirements is a question to be determined initially by the agency. Such a determination is subject to fairly strict judicial review because an erroneous negative assessment of environmental impact by the agency precludes a detailed study of the project's environmental effects.

Section 102(1) of the Act contains a Congressional direction that environmen-

tal factors be considered "to the fullest extent possible." An initial decision not to prepare an EIS [environmental impact statement] precludes the full consideration directed by Congress. In view of the concern for environmental disclosure present in NEPA, the agency's discretion as to whether an impact statement is required is properly exercised only within narrow bounds. Action which could have a significant effect on the environment should be covered by an impact statement. We think that the threshold decision as to whether or not to prepare an EIS should be reviewed not on the arbitrary and capricious standard used to test a substantive decision which entails a balancing and weighing of alternatives already studied, but on the grounds of its reasonableness.

. . . To upset an agency determination not to prepare an impact statement, it . . . must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project could significantly affect the quality of the human environment.

*Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir. 1974) (en banc). Thus, the determination of the Department of Labor that the proposed Job Corps center was not a major federal action significantly affecting the quality of the human environment may be overturned if and only if it is unreasonable.[1]

■ The federal defendants argue first that the proposed Job Corps center is not a "major Federal action." Some courts have separated the scope of the federal action and its environmental effect into independent criteria. E. g., *Hanly v. Mitchell,* 460 F.2d 640, 644 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (a major federal action does not necessarily

1. Besides contending erroneously that judicial review of their negative assessment of environmental impact is constricted, the federal defendants maintain that the scope of this Court's review is limited to consideration of the administrative record. While in a sense it is true that the question before the Court is the sufficiency of the administrative record, it by no means follows that the question may be resolved on the basis of the administrative record alone.

As stated in *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978):

Although the focus of judicial inquiry in the ordinary suit challenging nonadjudicatory, nonrulemaking agency action is whether, *given the information available to the decisionmaker at the time,* his decision was arbitrary or capricious, and for this purpose "the focal point for judicial review should be the administrative record already in existence, not *some new record made initially in the review-*ing court", . . . ., in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, . . . ., which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.

. . . Generally, . . . allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept "stubborn problems or serious criticism . . . under the rug," . . . ., raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary. [emphasis in original].

See also, *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 170, 487 F.2d 1029, 1041 & n. 13 (1973). If the federal agency has overlooked or inadequately assessed a possible adverse environmental impact, it is unlikely that the deficiency will be apparent from examination of the record itself. Given the scheme of NEPA and the scrutiny with which the judiciary must eye negative assessments of environmental impact, a reviewing court cannot be restricted to the administrative record.

It has been suggested that a court should receive evidence beyond that considered by the agency only if the plaintiff raises substantial environmental issues or shows an inadequate evidentiary development by the agency. E. g., *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 425 (5th Cir. 1973); *Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522 (5th Cir. 1978). Here, the plaintiff has raised substantial environmental issues, and, indeed, had shown at the preliminary injunction hearing a strong probability of prevailing on the merits.

have significant environmental effects); *Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972). Whether a particular federal action is "major" depends on the amount of federal funds expended, the number of people affected, the length of time consumed, and the extent of government planning involved. *S. W. Ngbrhd. Assembly v. Eckard,* 445 F.Supp. 1195, 1199 (D.D.C.1978). The Court of Appeals for the Eighth Circuit has refused, however, to bifurcate the action-forcing provision of section 102(2)(C):

> To separate the consideration of the magnitude of federal action from its impact on the environment does little to foster the purposes of the Act, *i. e.,* to "attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable and unintended consequences." By bifurcating the statutory language, it would be possible to speak of a "minor federal action significantly affecting the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment. . . .

*Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1321–22 (8th Cir. 1974) (en banc). Accord, *City of Davis v. Coleman,* 521 F.2d 661, 673 n. 15 (9th Cir. 1975). See also, W. Rodgers, Jr., Environmental Law § 7.6 (1977). In neither assess-

ment did the Department of Labor determine whether this project constitutes a "major federal action." The Court finds, given the federal sums involved, that establishment of the Job Corps center is a major federal action, even were the criteria independent. The question thus becomes whether the proposed Job Corps center could significantly affect the human environment.

■ In support of its negative assessment of environmental impact, the Department of Labor urges that "people pollution"[2] is not cognizable as an environmental impact under NEPA. The Court agrees that the mere influx of low-income persons into a wealthier community should not be regarded as an adverse environmental impact. See, *Town of Groton v. Laird,* 353 F.Supp. 344, 350–51 (D.Conn.1972). It seems clear that the intent of Congress was that certain sociological or economic effects alone do not necessitate preparation of an environmental impact statement. *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 158, 166, 487 F.2d 1029, 1037 (1973) (Leventhal, J.); *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225, 231 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) (dictum); see, *First Nat'l Bank v. Richardson,* 484 F.2d 1369, 1380 n. 13 (7th Cir. 1973). But cf. *Hanly v. Kleindienst,* 471 F.2d 823, 832 & n. 10 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).[3] However, the pro-

2. The term "people pollution" was apparently coined by Judge Leventhal in *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 158, 166, 487 F.2d 1029, 1037 (1973), to denote the impact of the presence of persons of low income on a more affluent community. The Department argues: "It is obvious that the 'fundamental changes' alleged by plaintiffs [sic] in the nature of the [Bethel College] facility, in reality pertain to the racial, cultural and financial backgrounds of the prospective enrollees—factors which are not proper considerations under NEPA and are an anathema to the findings and purpose of the Comprehensive Employment and Training Act which mandates the Job Corps program." (Mem. in Support of Motion

To Vacate Preliminary Injunction, pp. 4–5 (footnotes omitted)). In other words, "people pollution" refers to the impact of persons who by reason of their background and experience are or may be different than the persons already present in the community.

3. It has been held that, absent a primary impact on the physical environment, social and economic effects alone do not mandate preparation of an environmental impact statement. *Image of Greater San Antonio v. Brown,* 570 F.2d 517 (5th Cir. 1978) (reduction in force at air force base); *Breckinridge v. Rumsfeld,* 537 F.2d 864 (6th Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (reduction in employment at army depot); *Nation-*

posed Job Corps center does not threaten merely "people pollution." Plaintiff has pointed out other values which it seeks to protect such as freedom from traffic congestion and criminal activity, and preservation of the character of the neighborhood. These factors have been found to be legitimate elements of the "human environment" which federal decisionmakers must consider in determining the necessity of preparing an environmental impact statement.

The leading cases are *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) [*Hanly I*]; and *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) [*Hanly II*]. See also, *Hanly v. Kleindienst,* 484 F.2d 448 (2d Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). In the *Hanly* cases, the General Services Administration (GSA) attempted construction of a nine-story jail and a nine-story conventional office building behind the United States Courthouse in Manhattan without preparation of an environmental impact statement. Plaintiffs lived near the proposed construction site, most notably in two large apartment buildings across the street. In *Hanly I,* the Second Circuit upheld denial of preliminary injunctive relief with respect to the office building, but reversed as to the jail. The GSA had adequately considered the jail's impact on water, heat, sewer, and garbage resources, but the environmental assessment was insufficient because it did not include consideration of the effect of the jail on the neighborhood.

The . . . memorandum does adequately discuss problems of water, heat, sewage and garbage. But those considerations apply to virtually any building. The memorandum contains no hard look at the peculiar environmental impact of squeezing a jail into a narrow area directly across the street from two large apartment houses. Indeed, there is not even a word about those apartment houses or the others located nearby. . . .

. . . The National Environmental Policy Act contains no exhaustive list of so-called "environmental considerations," but without question its aims extend beyond sewage and garbage and even beyond water and air pollution. . . . The Act must be construed to include protection of the quality of life for city residents. Noise, traffic, over-burdened mass transportation systems, crime, congestion and even availability of drugs all affect the urban "environment" and are surely results of the "profound influences of . . . high-density urbanization [and] industrial expansion." . . . Thus, plaintiffs do raise many "environmental considerations" that should not be ignored. We believe the record in this case indicates that, as to the proposed jail, they were.

460 F.2d at 646–47. Construction of the jail was stayed pending an environmental reassessment by the GSA in light of these legitimate environmental factors. The agency in a 25-page document determined that no significant environmental impact would re-

---

al Ass'n of Gov't Employees v. Rumsfeld, 418 F.Supp. 1302 (E.D.Pa.1976) (closing of arsenal); *Township of Dover v. United States Postal Serv.,* 429 F.Supp. 295 (D.N.J.1977) (consolidation of small postal processing facilities); *Metlakatla Indian Community v. Adams,* 427 F.Supp. 871 (D.D.C.1977) (relocation of Coast Guard air station); *National Ass'n of Gov't Employees v. Rumsfeld,* 413 F.Supp. 1224 (D.D.C.1976), aff'd mem. sub nom., *National Ass'n of Gov't Employees v. Brown,* 181 U.S.App. D.C. 199, 556 F.2d 76 (1977) (reduction in work force at army depot); *Marin City Council v. Marin County Redev. Agency,* 416 F.Supp. 700 (N.D.Calif.1974) (housing development). But cf. *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975), approved in *Jackson County v. Jones,* 571 F.2d 1004, 1007 (8th Cir. 1978) (relocation of Air Force personnel); *City of Rochester v. United States Postal Serv.,* 541 F.2d 967 (2d Cir. 1976) (construction of mail facility in suburban Rochester and abandonment of downtown post office). See also, *National Citizens Comm. for Brdcstg. v. FCC,* 186 U.S.App. D.C. 102, 105, 567 F.2d 1095, 1098 n. 3 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct 2820, 56 L.Ed.2d 769 (1978); *City of Santa Clara v. Kleppe,* 418 F.Supp. 1243, 1263–65 (N.D.Calif. 1976), aff'd in this part sub nom. *City of Santa Clara v. Andrus,* 572 F.2d 660, 679–80 (9th Cir. 1978).

sult and the district court again denied preliminary injunctive relief. In *Hanly II,* the Second Circuit again reversed and remanded for agency reconsideration because the GSA had not considered the increased risk of crime the jail and an outpatient drug-maintenance program might threaten.

■ In other cases courts have similarly found that impacts on an urban environment must be considered under NEPA.[4] The environmental concerns courts have expressed in these cases may be classified into four somewhat overlapping categories. The first regards what might be termed health and public safety. Courts have examined a project's potential effect on the quality of air and water, the noise level of the community, and the capacity of existing or proposed sewage and solid-waste disposal facilities. Relevant as well is whether the project will affect the local crime rate, present fire dangers, or otherwise unduly tap police and fire forces in the community. The second category involves consideration of the project's impact on social services, such as the availability of schools, hospitals, businesses, commuter facilities, and parking. Apart from its impact on a community's services, a project may alter the character of the area in which it locates—the third category. Conformance to local zoning ordinances, harmonization with proximate land uses, and a blending with the aesthetics of the area are concerns relevant to this category. The final category involves consideration of the project's impact on the community's development policy. Relocation of a federal facility from a downtown to a suburban location, for example, might contribute to urban blight and decay. Neighborhood stability and growth are values which have been found to be cognizable under NEPA.

While this categorization of environmental concerns may not be particularly helpful in analyzing the environmental impact of a particular project, the categories do serve to illuminate the breadth of the "human environment" NEPA contemplates. To an increasing degree, the categories reflect a departure from traditional notions of the

4. See, *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973) (bulk mail facility in industrial development); *City of Rochester v. United States Postal Serv.,* 541 F.2d 967 (2d Cir. 1976) (construction of mail facility in suburban Rochester and abandonment of downtown post office); *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88 (2d Cir. 1975), rev'g 387 F.Supp. 1044 (S.D.N.Y. 1974), on remand sub nom. *Trinity Episcopal School Corp. v. Harris,* 445 F.Supp. 204 (S.D. N.Y.1978) (low-income housing project); *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421 (5th Cir. 1973) (low- and moderate-income apartment project in Houston); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973) (office building in downtown Mobile, Alabama); *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) (low-income housing project); *First Nat'l Bank v. Richardson,* 484 F.2d 1369 (7th Cir. 1973) (parking garage and detention center in Chicago); *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973) (commercial redevelopment); *S. W. Ngbrhd. Assembly v. Eckard,* 445 F.Supp. 1195 (D.D.C.1978) (office building on Buzzard's Point in southwest Washington, D.C.); *Town of Groton v. Laird,* 353 F.Supp. 344 (D.Conn.1972) (housing for submarine base); *Goose Hollow Foothills League v. Romney,* 334 F.Supp. 877 (D.Ore. 1971) (high-rise student apartment building); *Morgan v. United States Postal Serv.,* 405 F.Supp. 413 (W.D.Mo.1975) (expansion of parking lot for postal facility); *Businessmen Affected Severely v. D.C. City Council,* 339 F.Supp. 793 (D.D.C.1972) (high-rise office buildings in downtown Washington, D.C.); *Maryland-National Capital Park & Planning Comm'n v. Martin,* 447 F.Supp. 350 (D.D.C. 1978) (consolidation of Defense Department mapping facilities); *City of New Haven v. Chandler,* 446 F.Supp. 925 (D.Conn.1978) (construction of electrical transmission towers in harbor); *Higgins v. United States Postal Serv.,* 449 F.Supp. 1001 (D.Mass.1978) (construction of general mail facility); *Marin City Council v. Marin County Redev. Agency,* 416 F.Supp. 700 (N.D.Calif.1975) (housing development in urban renewal project); *City & County of San Francisco v. United States,* 443 F.Supp. 1116 (N.D.Calif.1977) (leasing of naval shipyard); *Town of Bethlehem v. United States Dep't of Labor,* Civ. 76–439 (N.D.N.Y. Dec. 22, 1976) (Job Corps center); cf. *Ely v. Velde,* 451 F.2d 1130 (4th Cir. 1971) (medical and reception center for prisoners in rural historic Virginia); *Chelsea Ngbrhd. Ass'ns v. United States Postal Serv.,* 516 F.2d 378 (2d Cir. 1975) (vehicle maintenance facility and public housing; adequacy of environmental impact statement).

environment, and they substantiate plaintiff's allegations of harm as legitimate environmental concerns.

Paragraph 9 of the complaint enumerates the specific environmental harms plaintiff foresees as resulting from establishment of the Job Corps center: vehicular and pedestrian congestion; demand for increased fire and police protection; increased strain on other services such as public transportation, legal services, emergency health care, and utilities; increased criminal activity; a loss in residential property values; and substantial alteration of the residential character of the neighborhood. The original assessment of environmental impact prepared by the Department of Labor on November 3, 1977, dealt explicitly with only one of the harms plaintiff alleges. It, as well as the administrative record submitted to the Court for the preliminary injunctive hearing, dealt all but exclusively with the proposal's impact on utility demands and local energy resources, detailing as well the renovation necessary to render the existing buildings suitable for a Job Corps center. After the Court granted preliminary injunctive relief, the Department compiled the complete record on which it based its original negative assessment (Defs. Exs. 1–29, 37, 45, 48–50. See also, Defs. Exs. 42, 43) and, without conceding that that record was deficient, undertook a supplemental study of the external environmental effects of the Job Corps center. (Defs. Ex. 52. See also, Defs. Exs. 30–36, 38–41, 44, 46, 47, 51) The Court will evaluate the reasonableness of the agency's reassessment of insignificant environmental impact (Defs. Ex. 53) which was based on the entire administrative record.

■ The administrative record before the Court is a document of impressive proportions. Because plaintiff has raised substantial claims of environmental harm and because the policies underlying NEPA favor preparation of an environmental impact statement, the Court will judge the reassessment and supporting record under the rather stringent four-pronged test first advanced by Judge Leventhal in *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App. D.C. 158, 170, 487 F.2d 1029, 1040 (1973). Accordingly, the reasonableness of the Department of Labor's negative assessment of environmental impact will be gauged by the following standards:

(1) Did the agency take a "hard look" at the environmental problems?

(2) Did the agency identify the relevant areas of environmental concern?

(3) As to problems studied and identified, does the agency make a convincing case that the impact is insignificant?

(4) If there is impact of true "significance" has the agency convincingly established that changes in the project have sufficiently minimized it?

It is apparent from the administrative record that the Department of Labor has taken a "hard look" at the environmental effects establishment of the Job Corps center might create. While the reassessment itself (Defs. Ex. 53) might seem conclusory and in some respects superficial, the supporting supplemental study contains a detailed analysis of all relevant environmental concerns. The controversy is whether the Department has made a convincing case that each environmental impact is insignificant, or has convincingly established that impacts of significance have been sufficiently minimized.

1. *Vehicular and pedestrian congestion*

■ The Department of Labor has demonstrated that the proposed Job Corps center will not increase congestion in the area of the Bethel campus. The 411 potential residential enrollees of the center will be served by 140 staff of whom no more than 80 members will be on the premises at a given time. (Defs. Exs. 42, ¶ 5; 54, ¶ 4) The total number of occupants of the center thus compares favorably with the use to which Bethel had recently put the site: as a campus during the 1971–72 school year for 1,139 students of whom 397 lived in dormitories, and as dormitory housing since September, 1972, for 400 to 430 students. At

present, the site provides 92 off-street parking spaces. (Defs. Ex. 52, at 39) Since enrollees are not permitted vehicles (Defs. Ex. 43, ¶ 5), parking for staff and visitors should be adequate. (See also, Defs. Ex. 42, ¶ 4) In any event, the Department has assured the Governor that sufficient off-street parking will be available. (Defs. Ex. 41, pt. 1, ¶ 7) The amount of traffic should be reduced as well because at present the Bethel students residing on the campus must commute daily to Arden Hills for classes. It should be noted also that the site is served by one of the city's major thoroughfares, Snelling Avenue. (See, Defs. Exs. 52, at 97–99; 47)

Because the number of occupants of the center corresponds favorably to the numbers present when Bethel occupied the site, pedestrian congestion should not appreciably increase. It might well decrease because Job Corpsmembers may leave the premises with authorization only if they obtain a pass. (Defs. Ex. 52, at 156–58) Plaintiff introduced evidence of absenteeism at a Job Corps center in Tulsa, Oklahoma. (Testimony of Michael Phillips; Pltf. Exs. 1A–I) This evidence is not necessarily probative of Job Corpsmembers roaming unsupervised through the surrounding community, nor is it very probative of the effect that should be expected from the proposed Job Corps center. Congress has explicitly directed that standards of conduct are to be stringently enforced at Job Corps centers. 29 U.S.C. § 920, as amended, Comprehensive Employment and Training Act Amendments of 1978 § 459. Apparent laxity of disciplinary enforcement at one center should not be attributed as a matter of course to other centers. The Court is convinced that neither vehicular nor pedestrian traffic resulting from the center's presence will cause any significant increase in congestion in the area.

**5.** Arrangements for emergency back-up care (Defs. Ex. 42, ¶ 7) and hospitalization (Defs. Ex. 52, at 159) will be made with local health-care facilities.

### 2. *Impact on local utilities*

The Department of Labor plans no new construction for the Bethel site and will spend over $1 million to renovate the eight existing buildings. Because the number of occupants of the center will approximate the previous population of the campus, no appreciable impact on municipal water or sewer systems or significantly increased demand on natural gas or electrical resources is reasonably foreseen. (Defs. Exs. 4; 52, at 39–69, 159)

### 3. *Impact on community social services*

A Job Corps center is in most respects a self-contained facility. The Job Corps provides primary health care (Defs. Exs. 42, ¶ 7; 52, at 12–13; 159; see, 29 C.F.R. §§ 97a.61–.72),[5] legal services (Defs. Ex. 52, at 159; see, 29 C.F.R. § 97a.92), transportation for special events (Defs. Exs. 42, ¶ 5; 52, at 159), and recreational facilities (see, e. g., Defs. Ex. 4, at 1; 29 C.F.R. § 97a.74). Location of the center in a metropolis further minimizes its impact on the social services of the community. It is reasonable to conclude, as the Department of Labor did, that the center's impact on the provision of local services would be insignificant.

### 4. *Contribution to criminal activity*

The impact a Job Corps center might have on the security of an urban environment is an emotionally charged issue. Members of plaintiff understandably fear an influx of disadvantaged youth in their neighborhood when reports from other Job Corps centers portend increased criminal activity. The Department of Labor, just as understandably, emphasizes that a Job Corps center is not a punitive or correctional facility and that the youths enrolled in the program are entitled to an opportunity to better themselves. The incidence of crime as an environmental impact cannot be determined by a comparison of emotional fervor.[6] Because plaintiff's fears, while un-

**6.** Mere opposition to a federal project does not make the project controversial so as to require an environmental impact statement. See, 40 C.F.R. § 1500.6(a); *Hanly v. Kleindienst,* 471

derstandable, are not based on a significant likelihood of danger to the community, the Court concludes that the Department of Labor acted reasonably in determining that the proposed Job Corps center would not appreciably affect public safety in the neighborhood.

Pursuant to legislation and regulation, Job Corps applicants are carefully screened and enrollees are subject to disciplinary procedures. 29 U.S.C. §§ 913(4), 914, 915, 920, as amended, Comprehensive Employment and Training Act Amendments of 1978 §§ 452(4), 453, 454, 459; 29 C.F.R. §§ 97a.30–.32, .36, .51, .73(d)(2), .97, .117. As operator of a federal facility, the Job Corps is primarily responsible for providing adequate security personnel to police the center, although it is customary to make arrangements with the local police force for back-up support in the event of an emergency. (29 C.F.R. § 97a.117; Defs. Exs. 37; 42, ¶ 8; 43, ¶ 7; 52, at 159–60) Usually one security-related employee is hired for every 50 enrollees. Defs. Ex. 52, at 159) All of these measures are designed in part to ensure the safety of the community in which the Job Corps center locates.[7]

Plaintiff has introduced evidence of disturbances at and near other Job Corps centers. The Department of Labor has considered in the administrative record plaintiff's charges of threats to public safety elsewhere. (Defs. Ex. 52, at 165–66. See also id. at A–251 to –253, A–298 to –437.) It is proper to characterize the more serious of these occurrences as isolated incidents, the stuff of which headlines are made, in the history of the Job Corps, which has had 620,000 enrollees and an enrollment in 1977

of 22,000. (Defs. Ex. 52, at 8, 9) The more minor of these offenses may be characterized as a normal incident of gathering a significant number of teen-aged youths in one location and can be significantly reduced by the exercise of stringent discipline and supervision. (See generally, Deposition of Andrew Pecile) The Department of Labor advances arrest statistics in proof that Job Corpsmembers have substantially fewer arrests than do comparably aged youth. (Defs. Ex. 36; 52, at 166–70) Plaintiff cogently challenges the meaningfulness of this statistical comparison (Mem. Oppos. Motion to Vacate Preliminary Injunction, at 5–12), but setting the statistics aside does not impel a finding of significant environmental impact.

Even if one regards a rise in crime in communities near other centers to be significant, that is not necessarily probative of increased criminal activity at the proposed Job Corps center. The Job Corps has learned some lessons from perhaps unfortunate placements of centers in the past, and from lack of proper discipline and supervision. (See, Defs. Ex. 52, at A–253; Deposition of Andrew Pecile. See also, Defs. Ex. 52, at 187, A–152) The proposed center is medium-sized and will be coeducational. Recruitment will be predominantly local. (See, Defs. Ex. 52, at 28) The center will not be located in an isolated small town, where its impact may be significant, but in the midst of a large metropolitan area. All of these factors tend to dissipate the impact enrollees and visitors to the center may present, making it not unreasonable for the Department of Labor to characterize the impact as insignificant.

F.2d 823, 830 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); Fund for Animals v. Frizzell, 174 U.S.App.D.C. 130, 137, 530 F.2d 982, 989 n. 15 (1975); Rucker v. Willis, 484 F.2d 158, 162 (4th Cir. 1973); Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 426 (5th Cir. 1973); Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225, 231–32 (7th Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); Simmans v. Grant, 370 F.Supp. 5, 16 (S.D.Tex.1974); Maryland-National Capital Park & Planning Comm'n v. Martin, 447 F.Supp. 350, 353 (D.D.C.1978); City of New Haven v. Chandler, 446 F.Supp.

925, 932–33 (D.Conn.1978); cf. Morgan v. United States Postal Serv., 405 F.Supp. 413, 423–24 n. 13 (W.D.Mo.1975); National Ass'n of Gov't Employees v. Rumsfeld, 418 F.Supp. 1302, 1307 (E.D.Pa.1976). But see, Hanly v. Kleindienst, 471 F.2d 823, 838–39 (2d Cir. 1972) (Friendly, C. J., dissenting), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

7. Congress intended that some Job Corps training centers be placed in an urban setting. See, 29 U.S.C. § 917(a), as amended, Comprehensive Employment and Training Act Amendments of 1978 § 456(a).

In addition, the Memorandum of Agreement between the Governor and the Department of Labor contains assurances which would further minimize the dangers plaintiff envisions. The agreement provides that all enrollees will be Minnesota youth,[8] that the community will have input as to selection of certain enrollees,[9] that the center will establish a 24-hour telephone service for reporting emergency or suspicious conditions,[10] and that persons with a serious criminal history not be selected for enrollment.[11] The agreement further provides that the Governor is to assess periodically the effect of the center on the neighborhood and after its first year of operation deliver written recommendations to the Secretary of Labor as to continued operation of the center.[12]

Plaintiff argues that provisions of the agreement limiting enrollment to Minnesota youth and excluding individuals with a

---

8. Paragraph 4 of part one of the Memorandum of Agreement provides:

All enrollees will be Minnesota youth. If after a period of time, not less than one year, the State of Minnesota is unable to provide sufficient enrollees to fill the Center, the Department of Labor will ask the Governor for his recommendations. After a reasonable period of time, if the recommendations do not result in the filling of the Center with Minnesota youth, the Department of Labor may take whatever actions it believes are necessary to operate the Center in a cost effective manner. Priority of admission will under all circumstances be given to Minnesota youth.
(Defs. Ex. 41, pt. 1, ¶ 4)

9. Paragraph 12 of part one of the Memorandum of Agreement provides:

Three individuals selected from the ad hoc committee (and the Community Advisory Council after the Center opens) will review applications of those individuals identified by the State Job Corps Coordinator about whom there is some question of their ability to make a successful adjustment to the Center. In the case of a disagreement between the committee and the coordinator as to the recommended action, both recommendations will be submitted to the Department of Labor for their action. The names and addresses of individuals will be withheld to protect their privacy during the community review process. Such procedures will be in compliance with the Federal Privacy Act. Reviews of applications will be in compliance with the screening and selection criterion in the Job Corps Statutes and Regulations.
(Defs. Ex. 41, pt. 1, ¶ 12. See also *id.* ¶¶ 8, 11, 13, 14; *id.* pt. 2, ¶ (e))

10. Paragraph g of part two of the Memorandum of Agreement provides:

The Center shall publicize a twenty-four hour telephone number for reporting emergency or suspicious conditions in the neighborhood which may be associated with the Center or its enrollees. The Center's staff will be made available on a twenty-four hour basis to respond to such calls.
(Defs. Ex. 41, pt. 2, ¶ (g))

11. Paragraph 3 of part one of the Memorandum of Agreement provides:

(a) No individual shall be selected as an enrollee unless it is determined that there is reasonable expectation that he can participate successfully in group situations and activities with other enrollees, that he is not likely to engage in actions or behavior that would prevent other enrollees from receiving the benefit of the program or be incompatible with the maintenance of sound discipline and satisfactory relationships between any center to which he might be assigned and surrounding communities, and that he manifests a basic understanding of both the rules to which he will be subject and of the consequences of failure to observe those rules.
(b) No individual shall be selected who has a history of violent behavior against persons or property, repetitive delinquent acts, narcotics addiction, or other major behavioral aberrations including conviction for the commission of a felony. This prohibition shall apply irrespective of whether an individual is on probation, parole, under a suspended sentence or under the supervision of any agency as a result of court action.
(c) In determining whether an individual may be selected for participation, the Secretary may, in consultation with the Governor, after obtaining the opinion of a professionally qualified individual, conclude that an individual who would not otherwise be selected, should be permitted to participate in the program due to positive changes in the individual's personal behavior.
(Defs. Ex. 41, pt. 1, ¶ 3)

12. Paragraph 2 of part one of the Memorandum of Agreement provides:

Periodically, the Governor of Minnesota will assess the effect of the center on the neighborhood and the communities. At the end of the first year of operation, the Governor will notify the Secretary of Labor in writing with recommendations on continuation of the center. The Secretary of Labor will review the Governor's recommendations and fully consult with the Governor in determining the future status of center operations.
(Defs. Ex. 41, pt. 1, ¶ 2)

serious criminal history are illegal and unenforcible.[13] The Department of Labor contends that the agreement is valid. Determination of the enforcibility of the provisions, if need be, is for another forum another day. The Court notes that the agreement provides that "[n]othing in this agreement is intended to supercede applicable Federal, State or local laws as they apply to the issues discussed here." (Defs. Ex. 41, at 1) Congress intends that only such disadvantaged youth as can be reasonably expected to successfully complete the training program be accepted as enrollees and that enrollees be subject to a disciplinary code that is stringently enforced. (See statutory authorities cited on page 862 supra). The Department of Labor has pledged its good faith in handling problems if they arise (see, e. g., Defs. Exs. 53, at 4; 54, at 154), and has informed the Governor that:

> The Center will work closely with the Community Advisory Council in identifying, should they occur, disciplinary problems with corpsmembers affecting the community. Center staff shall take appropriate actions to eliminate problems should they occur.

(Defs. Ex. 41, pt. 2, ¶ (e)) Whether or not the provisions of the Memorandum of Agreement plaintiff challenges are enforcible, the Court is convinced that sufficient steps have been taken to ensure that the impact of the center on the security of the neighborhood will not be significant.

### 5. Police and fire protection

The discussion above regarding possible increased criminal activity provides justification for the Department of Labor's determination that the center will not significantly affect the operation of the St. Paul police force. (See also, Defs. Ex. 52, at 103–06, 160–62) The Department's plan to refurbish the existing buildings to conform them to local codes lessens the risk of fire the buildings now present. (See, id. at 159) Plaintiff did introduce evidence of arson at other Job Corps centers,[14] but again, though such evidence might suffice to fuel neighborhood fears, it is only speculation to assert that arson will present a significant environmental threat at the proposed center.

### 6. Alteration of character of the neighborhood

Plaintiff argues that establishment of a Job Corps center on the Bethel site will substantially alter the residential character of the neighborhood and reduce residential property values. In support of its position, plaintiff contends that use of the Bethel site for a Job Corps center would not be permissible under the St. Paul zoning ordinance. Plaintiff does not ask the Court to enjoin the project pending a rezoning, but suggests quite correctly that a variance from local land-use regulation demands greater scrutiny under NEPA.

The administrative record does not mention the local zoning ordinance. (See, e. g., Defs. Ex. 52, at A–174) In a memorandum opposing plaintiff's motion for a preliminary injunction, the Department of Labor argued that the Job Corps center would be a valid nonconforming use or, alternatively, under the Supremacy Clause, U.S.Const. art. VI, cl. 2, the Department could establish a Job Corps center on the site, local zoning ordinances notwithstanding. (Mem. at 8–9) Thus, for purposes of this case, the Court will assume that operation of a Job Corps center on the Bethel site is not a use conforming to the zoning classification of the property.

In a number of cases involving NEPA, courts have recognized the relevance of a

13. Plaintiff relies on 29 U.S.C. § 916(d), as amended, Comprehensive Employment and Training Act Amendments of 1978 § 455(c), to challenge the validity of paragraph 4 of part one of the Memorandum of Agreement (quoted in note 8 supra.) It relies on section 454(b) of the Comprehensive Employment and Training Act Amendments of 1978 and Minn.St. ch. 364 to attack the validity of paragraph 3(b) of part one of the Memorandum of Agreement (quoted in note 11 supra).

14. Deposition of Michael Robertson, at 13–14; Deposition of Andrew Pecile, at 14; testimony of John D. Erskine.

variance between the proposed project and neighboring actual or permissible land uses. In *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.*, 159 U.S.App.D.C. 158, 165–166, 487 F.2d 1029, 1036–38 (1973), Judge Leventhal observed:

> The question of significance takes on a distinctive cast in the context of land use planning. We think that much may turn on whether the Federal Government conforms to or deviates from local or regional regulations of land use. . . . The policy goals of NEPA are to be achieved "in cooperation with State and local governments." Section 101(a), 42 U.S.C. § 4331(a).
>
> When local zoning regulations and procedures are followed in site location decisions by the Federal Government, there is an assurance that such "environmental" effects as flow from the special uses of land—the safety of the structures, cohesiveness of neighborhoods, population density, crime control, and aesthetics— will be no greater than demanded by the residents acting through their elected representatives. There is room for the contention, and there may even be a presumption, that such incremental impact on the environment as is attributable to the particular land use proposed by the Federal agency is not "significant," that the basic environmental impact from the project derives from the land use pattern, approved by local authorities, that prevails generally for the same kind of land use by private persons.
>
> When, on the other hand, the Federal Government exercises its sovereignty so as to override local zoning protections, NEPA requires more careful scrutiny. NEPA has full vitality and its policies cannot be taken as effectuated by local land use control, where the proposal of the Federal Government reflects a distinctive difference in kind from the types of land use, proposed by private and local government sponsors, that can fairly be taken as within the scope of local controls. The same considerations may apply where there are differences in degree so great as to make a difference in kind, or where potential environmental effects extend geographically beyond the control on [sic] one independent local and regional government. For example, whereas the Federal Government might legitimately defer to New York City zoning in matters of, say, population density, a different issue would be posed by the location within the city of an atomic reactor. Its peculiar hazards would not be limited to the citizens of New York, nor could they be controlled by them.
>
> . . . Not all deviations from local zoning will necessarily rise to the level of affecting the "quality of human environment" within the fair meaning of that term. . . .

Accord, *Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 231 & n. 4 (7th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Goose Hollow Foothills League v. Romney*, 334 F.Supp. 877 (D.Ore.1971); *Businessmen Affected Severely v. D.C. City Council*, 339 F.Supp. 793 (D.D.C.1972); *Morgan v. United States Postal Serv.*, 405 F.Supp. 413, 421 (W.D.Mo. 1975); *Maryland-National Capital Park & Planning Comm'n v. Martin*, 447 F.Supp. 350, 352 (D.D.C.1978); *Benton County Savings & Loan Ass'n v. Federal Home Loan Bank Bd.*, 450 F.Supp. 884, 890–91 (W.D. Ark.1978); *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 423 (5th Cir. 1973); cf. *Town of Groton v. Laird*, 353 F.Supp. 344, 350–51 (D.Conn.1972). See also, *Sierra Club v. Cavanaugh*, 447 F.Supp. 427, 432–33 (D.S.D.1978).

This Court has already scrutinized the proposed center's impact on vehicular and pedestrian congestion, local utilities, community social services, neighborhood security, and police and fire protection. Nevertheless, if a proposed project would radically differ from neighboring land uses so as to create a disharmony of aesthetics or frustrate a municipality's development plan, further study by the agency in an environ-

mental impact statement might be necessary.

The Department of Labor in the administrative record argues that "the area has not been and is not now primarily residential, but rather is educational and recreational in nature." (Defs. Ex. 52, at 154) If the area referred to by the Department of Labor is the St. Paul neighborhood immediately adjacent to the campus, this statement is erroneous. Indeed, the Department concedes as much in its Memorandum of Agreement with the Governor: "The Center will work closely with the Community Advisory Council to ensure its operations are not disruptive to the *predominantly residential nature of the immediate neighborhood.*" (Defs. Ex. 41, pt. 2, ¶ d (emphasis added). See also, Defs. Exs. 1, at 1; 52, at 35) From a bird's eye view, however, the Department's assertion is more accurate because aerial photos show that much of the larger area surrounding the Bethel College site is commercial and recreational. As previously stated, the State Fairgrounds are immediately across the street from the site, and Como Park is a short distance away. (See, Pltf. Exs. 4–8; Defs. Ex. 52, at 86–92)

In any event, location of the Job Corps center on the Bethel site will not substantially alter the character of the neighborhood. Bethel College and Seminary occupied the site in 1914, thus predating many of the neighboring residences. (Defs. Ex. 52, at 29, 75–79) No new construction has occurred on the campus since 1957. (*Id.* at 31) The Department of Labor does not propose construction of additional buildings or major alteration of the face of the campus. (Defs. Ex. 42, ¶ 3) It does intend to refurbish the existing buildings and to budget more funds for grounds maintenance than did Bethel College. (See, Defs. Ex. 30, at 2) The Court, therefore, cannot overturn the Department's judgment that use of the site as a Job Corps will substantially alter the character of the neighborhood.

No case has been cited to or discovered by the Court indicating that a diminution in neighboring property values as a result of construction of a federal project is an environmental impact cognizable under NEPA. In any event, the Department of Labor examined the allegation of economic loss in property value and has concluded that such effect is unlikely. (Defs. Ex. 52, at 171–72. See also, Defs. Ex. 32) [15]

### 7. Opportunity for public input

█ Relying on *Hanly v. Kleindienst,* 471 F.2d 823, 835–36 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), plaintiff argues that both the Department of Labor's original assessment of environmental impact and reassessment are fatally defective for failure to provide plaintiff a formal opportunity to present evidence as to environmental effects. Although public meetings regarding the Job Corps center were conducted, it appears that the Department did not provide members of plaintiff a formal opportunity to offer evidence.

In *Hanly v. Kleindienst,* while acknowledging an absence of statutory or administrative authority, a panel of the second circuit held "that before a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." *Id.* at 836. The court left for agency determination the mechanisms suited to gather public response to a particular action:

> The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data.

*Id.* See also, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense*

---

**15.** Mere diminution in market value alone does not constitute an unconstitutional taking. See, e. g., *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

*Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Harlem Valley Transp. Ass'n v. Stafford*, 500 F.2d 328, 336–37 (2d Cir. 1974); *Cross-Sound Ferry Servs. Inc. v. United States*, 573 F.2d 725, 731–32 (2d Cir. 1978).[16]

The public meetings participated in by the Department of Labor in May and October, 1977, and the Department's contacts with local government officials suffice to comply with the procedural requirements of NEPA as interpreted by the Court of Appeals for the Second Circuit. *Town of Groton v. Laird*, 353 F.Supp. 344, 347 n. 3 (D.Conn.1972). While the Court believes that more and earlier public participation would have been prudent, sensible and advisable, perhaps quelling neighborhood fears, it cannot hold that the Department of Labor abused its discretion in failing to seek more extensive or more formal public input. (See, Defs. Ex. 52, at 127–31, 142–75, 191–259)

## CONCLUSION

The role of the Court in adjudicating this controversy is a limited one. Plaintiff acknowledges the social desirability of the Job Corps program, but questions the decision of the Department of Labor to locate a Job Corps center on the former campus of Bethel College and Seminary in St. Paul. The issue before the Court is whether the Department acted reasonably in determining that establishment of the proposed center would not significantly affect the human environment. Based on the entire administrative record, the Court is convinced that the Department examined all relevant environmental factors and reasonably determined in a reviewable record that the impact of the center on the human environment would not be significant. No environmental impact statement need therefore be prepared. While the Court fully understands the concerns of the nearby residential community, and the earnestness with which those concerns have been pursued, it must conclude, based upon the entire record, that the Department of Labor has complied with the procedural demands of NEPA, and that plaintiff's complaint must be dismissed.[17]

The Court expects the Department of Labor to keep the pledge made in its Memorandum of Agreement with the Governor to involve the community in the operation of the center and to conduct the center with

**16.** Chief Judge Friendly, dissenting in *Hanly v. Kleindienst*, felt that the majority's holding required preparation of a "mini-impact statement" which would be "unduly burdensome when the action is truly minor or insignificant," 471 F.2d at 837, and would have held that the agency's efforts in the case would be better directed to preparation of a full-fledged environmental impact statement.

The *Hanly II* requirement has received mixed reviews outside the Second Circuit. Compare, *Simmans v. Grant*, 370 F.Supp. 5, 18 (S.D.Tex. 1974); *Continental Ill. Nat'l Bank & Trust Co. v. Kleindienst*, 382 F.Supp. 107, 113–14 (N.D. Ill.), aff'd, 484 F.2d 1369 (7th Cir. 1973) (favorable), with *National Ass'n of Gov't Employees v. Rumsfeld*, 418 F.Supp. 1302, 1307–08 n. 2 (E.D.Pa.1976); *Friends of the Earth, Inc. v. Butz*, 406 F.Supp. 742, 744–45 (D.Mont.1975), dismissed as moot, sub nom. *Friends of The Earth, Inc. v. Bergland*, 576 F.2d 1377 (9th Cir. 1978) (unfavorable). See also, *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320–21 n. 20 (8th Cir. 1974) (en banc).

**17.** A claim contained in plaintiff's complaint but not pressed at trial should be briefly examined. Plaintiff contends that the letter sent from the Secretary of Labor to Governor Perpich notifying the Governor of the Department's intent to establish a Job Corps center on the Bethel site (Defs. Ex. 5) failed to conform to the requirements of 29 U.S.C. § 925(c). That section provides:

No Job Corps center or other similar facility designed to carry out the purpose of this chapter shall be established within a State unless a plan setting forth such proposed establishment has been submitted to the Governor, and such plan has not been disapproved by him within 30 days of such submission.

Plaintiff contends that the letter as a "plan" was deficient in several respects. (Complaint, ¶ 15) Plaintiff's objections are at best academic. Governor Perpich did not rely solely on the letter to evaluate the desirability of the proposed center. The Governor took an active investigatory role, requested and received at least one extension of the 30-day disapproval period, and set rather stringent conditions on the center's operation when he gave his approval. See also, Comprehensive Employment and Training Act Amendments of 1978 § 464(c).

care, with prudence, and with concern for the community in which it is located. With such care on the part of the Department, and with sympathetic and thoughtful community participation, the center may become, as the Department and the Governor envisioned, a model for Job Corps centers elsewhere.

For the reasons set forth above, IT IS ORDERED:

1. That plaintiff's request for permanent injunctive relief halting establishment of a Job Corps center at the former campus of Bethel College and Seminary unless and until an environmental impact statement is prepared by the Department of Labor be and hereby is denied;

2. That the preliminary injunction issued in this case by this Court on February 22, 1978, enjoining establishment of the Job Corps center be and hereby is dissolved and without further force and effect.

LET JUDGMENT FOR DEFENDANTS BE ENTERED ACCORDINGLY.